*This opinion is subject to revision before*
*publication in the Pacific Reporter*

2015 UT 22

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*

*v.*

ROBERT BARELA,
*Defendant and Appellant.*

No. 20120476
Filed January 30, 2015

Third District, Salt Lake
The Honorable Robin W. Reese
No. 091903042

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Att'y Gen., Salt Lake City, for plaintiff

Elizabeth Hunt, Salt Lake City, for defendant

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
and JUSTICE PARRISH joined.

JUSTICE DURHAM filed a dissenting opinion.

JUSTICE LEE, opinion of the Court:

¶1 This is an appeal from a conviction of Robert Barela of first-degree rape. Barela claims that his trial counsel was ineffective in a variety of ways and asserts error in the district court's refusal to issue a subpoena for the victim's medical records. He also challenges the sufficiency of the evidence to establish that the victim of the alleged rape had not consented to sex, an issue that requires us to interpret the statutes defining nonconsent in the context of a rape charge.

¶2 We reverse, finding ineffective assistance in counsel's failure to object to a jury instruction misstating the requirement of mens rea as applied to the elements of first-degree rape. In reversing on this ground, we decline to reach a number of alternative grounds raised by Barela. But we do address two such grounds that implicate matters that may arise on remand, including the

interpretation of the statutory standard for nonconsent under Utah Code section 76-5-406 and the standard for a victim's medical records under rule 14(b) of the Utah Rules of Criminal Procedure.

¶3 First, without reaching the sufficiency of the evidence to sustain Barela's conviction, we interpret the statutory standard of nonconsent in a manner consistent with the State's theory on appeal, concluding that section 406 does not establish the sum and substance of all circumstances amounting to nonconsent, but instead simply prescribes the circumstances in which the legislature forecloses a jury finding of consent as a matter of public policy. Second, without reaching the merits of the request for a medical records subpoena in this case, we clarify the standard that applies under rule 14(b).

I

¶4 Barela had sex with K.M. at a Massage Envy studio, where Barela was employed as a massage therapist and K.M. was a client. K.M. had received one previous massage from Barela at the studio. And when she arrived on the date in question, she had not requested Barela as her therapist. K.M. removed all of her clothing for the massage. During the massage she was covered only by a sheet and blanket.

¶5 That much is undisputed. But as to other details of the events leading to the sexual encounter, the jury heard two very different stories. In Barela's version of the encounter, K.M. became aroused and initiated sexual contact by humping the table and grabbing Barela's crotch. The two then began having sex, in which K.M. showed active engagement by giving him oral sex, rolling over on the table, and playing with her breasts.

¶6 In contrast, K.M. told the jury that she was receiving a massage from Barela when he unexpectedly started massaging her inner thigh. She testified that she felt "very uncomfortable" because she had never had a massage therapist do that in previous massages, and she "didn't know how to respond." Then, "before [she] knew it," Barela pulled her to the end of the table, dropped his pants and penetrated her vagina with his penis. K.M. testified that "everything happened very fast" and that Barela may have touched or penetrated her vagina with his finger, but that she wasn't sure. She testified that Barela went from rubbing her thigh to penetrating her vagina within "a matter of seconds."

¶7 K.M. testified that she had not "flirt[ed]" with Barela, and did not say or do anything to suggest that she wanted to have sex with him. She also testified that she did not physically resist or verbally tell Barela "no"; she said nothing at all. Instead, she clung to the blanket and "just froze." She said she felt fearful because she was alone, and because the only other person in the massage parlor was a male receptionist. She repeatedly stressed that "everything happened very fast." She elaborated that she "checked out," "kind of withdrew," and "was scared." When asked to explain what "checked out" meant, K.M. said she just "kind of froze."

¶8 K.M. testified that she heard Barela make an alarmed (and profane) exclamation, and then saw him looking at semen in his hand. Then he told her "this concludes your massage" and left the room. K.M. got up as "quickly as [she] could," wiped herself with a towel, and got dressed. She testified that her main concern was "getting out of Massage Envy" as quickly as she could. Barela met her in the hallway, where he offered her water, which she accepted. She "checked out as normal," told the receptionist the massage was "fine," paid her bill (including a tip), and took a mint.

¶9 K.M. testified that she then drove away from the massage studio but pulled over a few blocks away. At that point she telephoned her friend, who described her as "frantic" and "very upset." She returned home to her partner, Trista, who said K.M. was sobbing, shaking, and hysterical. Trista drove K.M. to the hospital. At the hospital, K.M. was examined by a nurse trained in examining sexual assault victims. The nurse found semen in K.M.'s vagina, which was identified as Barela's through DNA testing. According to the nurse, K.M.'s physical condition was consistent with K.M.'s account. But she conceded that K.M.'s condition was also "consistent with consensual sex," as there was no genital injury, while explaining that only twenty to thirty percent of assault victims display genital injuries. The nurse also testified that sometimes victims of sexual assault or other shocks have a difficult time remembering the details of the event.

¶10 The defense's primary theory at trial was that K.M. had been the instigator and that the sex was consensual. In addition, the defense also asserted that K.M. had lied about the encounter in an effort to protect her relationship with Trista. In further explanation of this theory, the defense presented evidence that K.M.

and Trista had one child together (conceived by K.M. through artificial insemination), and that at the time of the massage K.M. was taking fertility medication and had been artificially inseminated only a few days earlier. The evidence also indicated that the perm donor was an African American friend of K.M. and Trista. Thus, the defense theory was that K.M. had consensual sex with Barela, worried that she had conceived and that the baby would resemble him (a "light-skinned Hispanic"), and that a "serious problem" would ensue when Trista realized that the baby did not resemble their African American donor.

¶11 The defense also challenged the plausibility of K.M.'s version of events. First, the defense highlighted elements of K.M.'s testimony that were allegedly inconsistent with her previous accounts of the rape: (a) that K.M. had told the nurse that Barela had massaged her genitals and told the police that he had penetrated her vagina with his finger, but at the preliminary hearing she could not remember whether he had penetrated her with his finger or with his penis and at trial could not remember whether he had touched her vagina at all; and (b) that K.M. had explained her freezing reaction in different ways at different times, characterizing it alternatively as a result of fear, surprise, or drowsiness.

¶12 The defense also asserted that K.M.'s actions after the sexual encounter were inconsistent with rape. It noted that K.M. had accepted water from Barela and checked out of the massage studio as normal and left a tip, without appearing (to the receptionist) to be upset. And the defense emphasized that K.M. had told Trista that she didn't know if she was raped because she didn't resist, a point arguably consistent with a statement she made to a police detective—that she didn't "necessarily . . . even care if he's convicted of a crime." Counsel also reminded the jury that there was no evidence of vaginal trauma. And the defense argued that if the rape occurred quickly as K.M. had indicated, it would stand to reason that she would have suffered genital injury.

¶13 After closing arguments, the jury was given its instructions. Instruction 13 enumerated the elements of the offense of rape. It indicated that in order to find Barela guilty of rape the jury would have to find the following:

1. The defendant, Robert K. Barela,

2. Intentionally or knowingly;

3. Had sexual intercourse with K.M.;

4. That said act of intercourse was without the consent of K.M.

¶14 Instruction 14 quoted a large portion of Utah Code section 76-5-406, which lists "circumstances" in which "[a]n act of sexual intercourse . . . is without the consent of the victim." The list in Instruction 14 did not make express reference to a circumstance in which the victim "freezes." But in closing argument the prosecutor asserted that Instruction 14 was not an "exhaustive list" that "tells you where as a matter of law consent doesn't exist." And the prosecutor told the jury that "ultimately it is up to you to determine if after listening to the facts consent exists in this case."

¶15 The jury found Barela guilty. Barela thereafter retained new counsel. His new counsel asked the court to issue a subpoena of K.M.'s medical records under rule 14(b) of the Utah Rules of Criminal Procedure, in order to support his post-verdict theory that K.M. was under the influence of prescription medication at the time of the massage. The district court declined to issue the subpoena, concluding that the request was not reasonably certain to provide exculpatory evidence. The court also noted that the timing of the request was "significant," as it had not yet heard the motion to arrest judgment or motion for new trial, and the subpoena request would be mooted if those motions were denied.

¶16 Barela then filed a motion for new trial. In support of that motion, Barela asserted first that the evidence of K.M.'s nonconsent was insufficient, particularly under Barela's reading of Utah Code section 76-5-406 (as providing an exclusive list of ways the prosecution may establish nonconsent). Second, Barela asserted that trial counsel had been ineffective in a variety of ways: in failing to introduce evidence corroborative of Barela's story, in failing to challenge evidence harmful to Barela, in failing to advance a mistake of fact defense, in failing to request a mistake of fact instruction, and in failing to object to Instruction 13 on the ground that it did not clearly require proof of mens rea as to K.M.'s nonconsent. The district court rejected each of these arguments and denied Barela's motion.

¶17 Barela challenges his conviction and the denial of his motion for new trial on grounds mirroring those asserted in support of his motion in the district court. We consider each of his argu-

ments under well-settled standards of review—yielding deference to the jury's determination of the sufficiency of the evidence[1] but addressing the legal questions he raises de novo.[2]

II

¶18 We consider three questions presented for review. First is Barela's claim of ineffective assistance in counsel's failure to present a mistake of fact theory to the jury and in failing to object to the mens rea requirement of the elements instruction given to the jury. On the second aspect of this claim (failure to object to the jury instruction), we find reversible error, as we conclude that reasonable counsel should have objected to a defect in the instruction and that defect was reasonably likely to have affected the verdict.

¶19 That determination renders unnecessary our analysis of Barela's alternative grounds for reversal. But we nonetheless proceed to consider two other legal issues raised by Barela that may be implicated on remand. Thus, without reaching Barela's assertion of insufficiency of the evidence of nonconsent, we address a threshold interpretive question implicated by this argument—regarding the nature and application of the principles of nonconsent set forth in Utah Code section 76-5-406. And finally, without reaching the merits of Barela's post-trial request for a medical records subpoena under rule 14(b) of the Utah Rules of Criminal Procedure, we interpret the terms of that rule as applied here.

---

[1] *See State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (stating that, on sufficiency of the evidence claims, the court "review[s] the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict" (internal quotation marks omitted)); *State v. Maughan*, 2013 UT 37, ¶ 14, 305 P.3d 1058 (indicating that we sustain all inferences made by the jury unless they fall "to a level of inconsistency or incredibility that no reasonable jury could accept" (internal quotation marks omitted)).

[2] *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, 308 P.3d 382 ("No deference is given to the lower court's analysis of abstract legal questions. . . . Our review of conclusions of law is accordingly de novo.").

A

¶20 Barela asserts two related grounds for his claim of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, Barela claims that his trial counsel was ineffective in limiting his defense to a "he-said, she-said" approach—in urging the jury simply to believe Barela's story that K.M. was the instigator and to reject K.M.'s contrary account. In Barela's view, counsel should instead have pressed an alternative theory, that even if Barela was the instigator, he was not guilty of rape because he was reasonably mistaken—or in other words lacked mens rea—as to K.M.'s nonconsent. And second, Barela also charges a related error in counsel's failure to object to the statement of the mens rea requirement in the elements instruction given to the jury (Instruction 13). We reject the first point but agree as to the second.

¶21 The threshold question under *Strickland* is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial. *Id.* at 489. Under that standard we uphold the reasonableness of counsel's decision to forgo a mistake-of-fact defense but find fault in the failure to object to the jury instruction.

¶22 It is easy to second-guess counsel's trial strategy from the rearview mirror of an appeal. Given that the jury rejected Barela's account and apparently accepted K.M.'s, it is tempting to deem counsel's strategy faulty. But that is not how *Strickland* analysis proceeds. We may not evaluate counsel's conduct from the hindsight-biased vantage point of the appeal. Instead, we must consider whether counsel's decision to proceed with the "he-said, she-said" approach was reasonable at the time he made this decision. Viewed in this light, there is no doubt that counsel's decisions were reasonable.

¶23 At the time of trial, counsel had ample reason to anticipate the meaningful possibility that the jury would reject K.M.'s account and accept Barela's. Some inconsistencies in K.M.'s story left some room for that hope, as, of course, did the high standard of proof beyond a reasonable doubt. And granted, counsel could legally have presented alternative theories to the jury. Thus, instead of just relying on Barela's account and discounting K.M.'s,

counsel could have openly entertained the possibility that K.M. was telling the truth, and invited the jury (through witness examination and in closing) to nonetheless acquit on the ground that he might have been the instigator but mistaken as to whether she consented. But the legal viability of this strategy does not render it the only reasonable one under *Strickland*.

¶24 If counsel had pursued this alternative defense, it could reasonably have anticipated doing significant damage to its principal theory. The damage would ensue from the fact that the alternative theory would require counsel to openly entertain the possibility that his client was lying. Such a move is legally tenable, but strategically fraught with risk. We cannot properly fault defense counsel for avoiding this risk and sticking with a single, straightforward defense on appeal. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 96, 267 P.3d 232 ( "[R]easonably informed strategic choices are almost unassailable").

¶25 Yet that same analysis cannot excuse counsel's failure to object to Instruction 13. That instruction, as quoted above, identified four elements of rape: "1. The defendant, Robert K. Barela, 2. Intentionally or knowingly; 3. Had sexual intercourse with K.M.; 4. That said act of intercourse was without the consent of K.M."

¶26 This instruction was in error. In asking the jury to consider whether Barela "intentionally or knowingly" "had sexual intercourse with K.M." and whether the intercourse was "without [her] consent," the instruction implied that the mens rea requirement ("intentionally or knowingly") applied *only* to the act of sexual intercourse, and not to K.M.'s nonconsent. It conveyed that idea by coupling the mens rea requirement directly with the element of sexual intercourse, and by articulating the element of K.M.'s nonconsent without any apparent counterpart requirement of mens rea.[3] That implication was error. After all, our criminal

---

[3] In response, the State asserts that the court of appeals upheld a similar instruction in *State v. Marchet*, 2009 UT App 262, ¶¶ 21–23, 219 P.3d 75. But the instruction in that case differed from the one here in a crucial respect: the mens rea element was listed last, after both the "sexual intercourse" and "nonconsent" elements. *Id.* ¶ 21. That instruction at least arguably suggests that the mens rea element applies to all of the above-listed elements. So we proceed

con't.

code requires proof of mens rea for each element of a non-strict liability crime,[4] and the crime of rape unmistakably includes the element of nonconsent.[5] So, as our court of appeals has held, the crime of rape requires proof not only that a defendant "knowingly, intentionally, or recklessly had sexual intercourse," but also that he had the requisite mens rea as to the victim's nonconsent. *State v. Marchet*, 2009 UT App 262, ¶ 23, 219 P.3d 75.

¶27 Instruction 13 was in error. And reasonable trial counsel should have objected to it. On this point, there is no reasonable strategy that could explain trial counsel's performance. Again, a reasonable lawyer could well have decided not to present alternative theories to the jury—particularly where (as here) the fallback theory (reasonable mistake as to nonconsent) could have undermined the primary one (the victim was the instigator). But no reasonable lawyer would have found an advantage in understating the mens rea requirement as applied to the victim's nonconsent. There is only upside in a complete statement of the requirement of mens rea, particularly in a case like this one where the jury could reasonably have decided to reject both the prosecution's case and the defense's case in a manner that could have led to an acquittal. Thus, trial counsel was ineffective in failing to object to Instruction 13.

¶28 That misstep, moreover, was reasonably likely to have affected the verdict. *See Strickland*, 466 U.S. at 696. The jury apparently did not accept all of Barela's story—of K.M. being the sexual instigator. But that does not foreclose the possibility that a properly instructed jury might still have rendered a verdict in his favor.

---

on the ground that *Marchet* is distinguishable, and without reaching the question of whether the instruction in that case was an accurate statement of law.

[4] *See* UTAH CODE § 76-2-101(1) ("A person is not guilty of an offense unless the person's *conduct is prohibited by law*; and the person acts intentionally, knowingly, recklessly, with criminal negligence, or with a mental state otherwise specified in the statute defining the offense . . . ." (emphasis added)).

[5] *See Id.* § 76-5-402(1) (defining the conduct prohibited by law as "sexual intercourse with another person *without the victim's consent*" (emphasis added)).

If Instruction 13 had clearly and correctly required the jury to find mens rea as to K.M.'s nonconsent, the jury could reasonably have acquitted Barela on the basis of a determination that he mistook K.M.'s reaction for consent. And on this record we conclude that that was reasonably likely.

¶29 The jury heard two different accounts of the events leading to Barela's sexual intercourse with K.M.—Barela's and K.M.'s. Barela painted K.M. as the instigator. K.M. had it the other way around (Barela as the instigator). But even in K.M.'s account, she never explicitly (in words) or openly (in physical resistance) rebuffed Barela's advances. Instead K.M. testified that she "froze"—neither actively participating in sex nor speaking any words.

¶30 On this record, we have no way of knowing how the jury processed these two stories. Thus, we cannot properly conclude that the jury found K.M.'s account "credible," as the dissent suggests. *Infra* ¶ 61.[6] Because the instructions required mens rea only as to sexual intercourse, all we know from the jury's verdict is that it concluded (a) that Barela's intercourse with K.M. was intentional or knowing, and (b) that K.M. did not consent. But that does not at all mean that the jury accepted K.M.'s story lock, stock, and barrel. The jury could easily have thought that the truth fell somewhere in between the two accounts—that K.M. was somewhat flirtatious but not the clear instigator (and did not ultimately consent). And even in that event, the jury (as incorrectly instructed) could still have found Barela guilty upon a mere finding of intercourse that was intentional and nonconsensual—but without ever considering Barela's state of mind as to K.M.'s consent.

¶31 The dissent makes much of the environment of a massage studio, asserting that K.M.'s state of undress was normal in this business setting and thus that "a reasonable massage therapist would not perceive the act of massaging the inner thigh of a client as an invitation for a sexual encounter in a place of business that is accepted when the client simply fails to object within a few se-

---

[6] It may well be that "[g]iven" the account offered by K.M., "it is highly probable that a properly instructed jury would have concluded that Mr. Barela knew that K.M. had not consented to sex." *Infra* ¶ 60. But we cannot take K.M.'s story as a given, as we have no way of knowing that the jury accepted it in its entirety.

conds." *Infra* ¶ 62. That is fair enough if one assumes that the jury accepted K.M.'s story in its entirety. But we cannot assume that, as our review under *Strickland* step two must be in light of the "totality of the evidence," *infra* ¶ 7, not just the evidence supporting the verdict. In light of the totality of the evidence in the record here, a reasonable jury could have found the truth to lie somewhere between K.M.'s and Barela's accounts. And if a jury so concluded, it is reasonably likely that the erroneous jury instruction could have made changed the outcome.

¶32 We reverse on this basis. A reasonable jury could have found the truth to lie somewhere between Barela's and K.M.'s accounts. And a reasonable jury viewing the evidence in that way could have acquitted Barela if correctly instructed—on the basis of a determination that Barela had neither knowledge nor recklessness as to K.M.'s nonconsent. We accordingly conclude that counsel's ineffective assistance was prejudicial, as it was reasonably likely to have changed the verdict.

B

¶33 That conclusion renders unnecessary any further analysis of Barela's other grounds for challenging the verdict in this case. But we nonetheless proceed to consider a couple of issues that he raises because they are likely to be implicated on remand. *See* Utah R. App. P. 30(a) (acknowledging appellate court's authority, in a case in which a "new trial is granted," to "pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case").

¶34 First we consider a legal question raised in Barela's challenge to the sufficiency of the evidence on the element of K.M.'s nonconsent. In challenging the sufficiency of such evidence, Barela has raised not only the fact-intensive question of the sufficiency of the evidence to sustain the jury's verdict, but also a threshold question of statutory interpretation. That legal question concerns the meaning of the terms of Utah Code section 76-5-406. Specifically, Barela asserts that section 406 prescribes an exhaustive list not encompassing the notion of K.M.'s nonconsent by "freezing" during the encounter at Massage Envy, and asserts that the evidence at trial was insufficient to sustain a viable jury finding of nonconsent under this understanding of the statute.

¶35 We need not and do not reach the factual question of the sufficiency of the evidence. But we do consider Barela's threshold

argument concerning the scope and meaning of section 406 because that issue is likely to be implicated on remand.

¶36 Utah Code section 76-5-406 is entitled "Sexual offenses against the victim without consent of victim—Circumstances." With regard to a number of enumerated sexual offenses, including rape, this statute states that "abuse is without consent of the victim" under "any of" twelve "circumstances" listed in the statute, as follows:

(1) the victim expresses lack of consent through words or conduct;

(2) the actor overcomes the victim through the actual application of physical force or violence;

(3) the actor is able to overcome the victim through concealment or by the element of surprise;

(4)(a)(i) the actor coerces the victim to submit by threatening to retaliate in the immediate future against the victim or any other person, and the victim perceives at the time that the actor has the ability to execute this threat; or

(ii) the actor coerces the victim to submit by threatening to retaliate [as defined in section (4)(b)] in the future against the victim or any other person, and the victim believes at the time that the actor has the ability to execute this threat; . . .

(5) the victim has not consented and the actor knows the victim is unconscious, unaware that the act is occurring, or physically unable to resist;

(6) the actor knows that as a result of mental disease or defect, the victim is at the time of the act incapable either of appraising the nature of the act or of resisting it;

(7) the actor knows that the victim submits or participates because the victim erroneously believes that the actor is the victim's spouse;

(8) the actor intentionally impaired the power of the victim to appraise or control his or her conduct by administering any substance without the victim's knowledge;

(9) the victim is younger than 14 years of age;

(10) the victim is younger than 18 years of age and at the time of the offense the actor was the victim's parent, stepparent, adoptive parent, or legal guardian or occupied a position of special trust in relation to the victim as defined in Section 76-5-404.1;

(11) the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim to submit or participate, under circumstances not amounting to the force or threat required under Subsection (2) or (4); or

(12) the actor is a health professional or religious counselor, as those terms are defined in this Subsection (12), the act is committed under the guise of providing professional diagnosis, counseling, or treatment, and at the time of the act the victim reasonably believed that the act was for medically or professionally appropriate diagnosis, counseling, or treatment to the extent that resistance by the victim could not reasonably be expected to have been manifested.

UTAH CODE § 76-5-406.

¶37 Barela would have us construe this statute as an exhaustive delineation of the metes and bounds of the element of nonconsent. His argument is twofold: (a) that this provision is aimed at defining the element of nonconsent—in prescribing the "valid theories" that the prosecution may use in establishing this element; and (b) that the list of valid theories is an exhaustive one.

¶38 We disagree. The statute does not define nonconsent. It merely "limits the various theories of consent that might otherwise be available." *State v. Salazar*, 2005 UT App 241, ¶ 9, 114 P.3d 1170. The point of the statute, in other words, is to foreclose the factfinder from deeming sex to be consensual in circumstances deemed substantively out of bounds as a matter of public policy.

¶39 As a general rule, consent—or nonconsent, to put it in terms of an element of a crime—is a fact-intensive, context-dependent question, decided on a case-by-case basis. *See State v. Myers*, 606 P.2d 250, 252 (Utah 1980). To determine whether a vic-

tim has truly consented, the factfinder must pay close attention to the verbal and nonverbal cues given by the victim and to a wide range of other elements of context.[7] These and other contextual nuances are the reason why, as a general rule, our law has long left the matter of consent in the hands of the jury.

¶40 This long-established, settled understanding is nowhere overridden by the terms of section 406. The statute nowhere prescribes any definition of nonconsent. Nor does it purport to set forth any sort of formula or criteria for the establishment of nonconsent. Instead, section 406 is best understood as prescribing exceptions to the general rule—as deeming certain circumstances beyond the case-by-case discretion of the factfinder. Thus, under section 406, the jury is foreclosed from finding consent by a victim who "expresse[d] lack of consent through words or conduct" (but *really* meant "yes"), UTAH CODE § 76-5-406(1); in circumstances in which the actor "overcomes the victim through the actual application of physical force or violence" or "through concealment or by the element of surprise,"[8] *id*. § 76-5-406(2), (3); or by a victim under the age of fourteen, *id*. § 76-5-406(9).

---

[7] The "freezing" circumstances of this case are an excellent example. Barela may be right to say that "freezing or non-participation may well be indistinguishable from normal sexual activity in many women." But that is just another way of saying that the question of consent is highly nuanced and context-dependent. Thus, the outward indicators of consent in one context may suggest nonconsent in another. A person who had previously been a victim of sexual assault might well respond to unwanted sexual contact in a post-traumatic-stress response of "freezing." And it would be reasonable under those circumstances for a jury to infer that the victim's freezing reaction was indicative of non-consent—and of the defendant's knowledge of nonconsent if the defendant was aware of the victim's past. But that does not suggest that "freezing" would always support such a determination, since as Barela indicates it might be possible for a defendant to establish that a victim's nonparticipation indicated consent in context.

[8] The State has cited this provision in its briefs as an alternative basis for an affirmance, asserting that even if the statute defines
con't.

¶41 These terms are not ultimately definitional. They simply direct, as a matter of law, that "abuse is without consent of the victim" under the circumstances enumerated in the statute. *Id*. § 76-5-406. We reject Barela's approach on that basis.

¶42 In so doing, we are also mindful of some practical problems implicated by Barela's approach. *See Encon Utah, LLC v. Fluor Ames* Kraemer, *LLC*, 2009 UT 7, ¶ 73, 210 P.3d 263 (explaining that "absurd results" may provide a basis for resolving a dispute between "two alternative readings" of a statute). Specifically, we note that under Barela's reading, a jury would be foreclosed from finding nonconsent in circumstances not encompassed by the terms of section 406 but still falling within the well-accepted meaning of this term. Thus, if section 406 were construed to identify the sum and substance of all circumstances in which nonconsent could be established, a jury would be foreclosed from finding nonconsent in a case where the actor knows that the victim submits or participates because the victim erroneously believes that the actor is the victim's *lover* (but not spouse)[9]; or where the power of the victim to appraise or control his or her conduct was impaired by the victim's *accidental ingestion* of a substance (not administered by the actor).[10]

¶43 Yet the settled understanding of *nonconsent* in the criminal law would easily support a guilty verdict in these circumstances. In the law of rape, "the essence of consent is that it is given out of free will." 65 AM. JUR. 2D *Rape* § 5 (2014); 75 C.J.S. *Rape*

---

"nonconsent" comprehensively, there was sufficient evidence to show that Barela "overc[a]me" K.M. "through concealment or by the element of surprise." UTAH CODE § 76-5-406(3). We do not reach this question because we do not read the statute to set forth a comprehensive definition of nonconsent.

[9] *See Id.* § 76-5-406(7) (indicating that sex is "without the consent of the victim" where "the actor knows that the victim submits or participates because the victim erroneously believes that the actor is the victim's *spouse*" (emphasis added)).

[10] *See id.* § 76-5-406(8) (sex is "without the consent of the victim" where "*the actor intentionally* impaired the power of the victim to appraise or control his or her conduct by administering any substance without the victim's knowledge" (emphasis added)).

§ 22 (2014) ("A rape victim need not orally express her lack of consent as long as the lack of consent is demonstrated by or can be implied from her acts and conduct."). *See also* BLACK'S LAW DICTIONARY 1151 (9th ed. 2009) (defining nonconsent as "the refusal to engage willingly in sexual intercourse"). That is why a victim who outwardly appears to express assent or approval may not have consented under the law—as her assent is not *freely* given if it is under circumstances of impairment, and it is not a matter of free *will* if it is a product of mistake of fact as to the identity of the victim. The above-noted hypotheticals are equally nonconsensual, as the degree of impairment from a substance is the same regardless of whether the actor administered it, and the mistake as to identity is as troubling for a lover as it is for a spouse. But Barela's reading of the statute would foreclose a conviction under these circumstances, as they are not precisely covered by section 406. We also reject Barela's construction on this alternative basis.

¶44 Thus, we interpret section 406 not as establishing the sum and substance of all circumstances amounting to nonconsent, but as simply prescribing the circumstances in which the legislature forecloses a jury finding of consent as a matter of public policy. And we base this decision not only on the plain terms of the statute, but also on the ground that it also avoids the absurdity of preventing a jury from finding nonconsent in circumstances properly understood to qualify as such.

¶45 We also reject Barela's claim that this approach is incompatible with our analysis in *State v. Jeffs*, 2010 UT 49, 243 P.3d 1250. Granted, the *Jeffs* opinion characterized certain theories of consent as "valid" or "invalid" under the terms of section 76-5-406. *Id.* ¶ 38. But in context, our analysis in *Jeffs* cannot be understood to construe section 406 as exhaustively defining the concept of nonconsent. Instead we were simply acknowledging that a conviction of rape may be reversed where it is based on an erroneous—"invalid"—jury instruction. *See id*. ¶¶ 33–38 (finding reversible error in an invalid jury instruction that misconstrued subsections (10) and (11) of section 406; explaining that under these subsections it must be the *actor*, and not a defendant charged with abetting the actor, who is in a position of special trust or entices or coerces the underage victim).

¶46 In other words, the *Jeffs* opinion held only that the jury must be properly instructed as to the terms and application of sec-

tion 406. An instruction misstating those terms is *invalid*, and potentially reversible error. But that in no way means that constructions of nonconsent outside the bounds of section 406 are *invalid*. We never said that in *Jeffs* and we clarify here that that is not our law.

C

¶47 Finally, we also consider the legal basis for Barela's challenge to the denial of his request for a medical records subpoena under rule 14(b) of the Utah Rules of Criminal Procedure—again on the ground that this issue may well arise again on remand.

¶48 In challenging the denial of his request for a rule 14(b) subpoena of K.M.'s medical records, Barela claimed two principal errors—one in the district court's determinations that the request was untimely (as it could be mooted if the motion for new trial were denied) and the other in its conclusion that the request was properly denied (in the sense of not being reasonably certain to produce exculpatory evidence). On the first point Barela asserted that the terms of the rule do not foreclose a post-trial request. And on the second he has insisted that his request was reasonably aimed at uncovering evidence in support of his post-verdict theory that K.M. had an "impulsive sexual relationship with him" and "was not a reliable witness."

¶49 Barela may have a (technical) point on the timeliness question. On its face the rule does leave some limited room for post-trial requests. *See* UTAH R. CRIM. P. 14(b)(3) (requiring request to be "filed with the court as soon as practicable, but no later than 30 days before trial, or *by such other time as permitted by the court*") (emphasis added). Yet the fact that a court *may* permit a request later than thirty days before trial does not mean that it *should* do so, much less that it would be reversed on appeal for not doing so. Presumably the trial court retains substantial discretion in deciding whether to grant a post-trial request under rule 14(b). And surely that discretion could be exercised in a manner considering whether the information requested could have been requested at least thirty days before trial. To succeed on his second point, Barela would have to establish that he was "entitled to production of the records sought under applicable state and federal law." UTAH R. CRIM. P. 14(b)(1). This is a high bar. In order to show that he is entitled to (presumptively privileged) medical records, a defendant must show, to a "reasonable certainty," that "the records

17

actually contain exculpatory evidence . . . favorable to his defense." *State v. Worthen*, 2009 UT 79, ¶ 38, 222 P.3d 1144 (internal quotation marks omitted). And in order to ensure that no privileged information is released that is unnecessary for discovering exculpatory information, the request must "identify the records sought with particularity and be reasonably limited as to subject matter." UTAH R. CRIM. P. 14(b)(2).

¶50 We do not reach the question whether the district court erred in denying the subpoena request in this case under these standards. But we do clarify that these are the governing standards, which will apply if the issue arises again on remand.

————

JUSTICE DURHAM, dissenting:

¶51 I agree that Mr. Barela's counsel provided ineffective representation by failing to object to the jury instructions. The instructions were erroneous because they implied that the State had to prove only that K.M. did not consent to sexual intercourse rather than prove that Mr. Barela had the requisite mens rea as to the victim's lack of consent. In other words, the instructions did not convey the requirement that the State prove Mr. Barela's intentional, knowing, or reckless state of mind regarding the absence of K.M.'s consent. *See State v. Calamity*, 735 P.2d 39, 43 (Utah 1987) (crime of rape "may be proved by an intentional, knowing, or reckless mental state"); UTAH CODE § 76-2-102 ("[W]hen the definition of [an] offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility.").

¶52 I disagree, however, with the majority's conclusion that Mr. Barela satisfied the second step of a *Strickland* ineffective assistance of counsel claim. *Supra* ¶¶ 28–32. In my view, Mr. Barela cannot show a reasonable probability that, but for the deficiency of trial counsel in failing to object to the instructions, the jury's verdict would have been different.

¶53 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to un-

dermine confidence in the outcome." *Id.* at 694. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

¶54  In *State v. Hutchings*, 2012 UT 50, ¶¶ 24–28, 285 P.3d 1183, we recently applied the *Strickland* prejudice standard in a similar case. We determined in *Hutchings* that a defense attorney's performance was deficient because the attorney failed to object to a potentially confusing mens rea jury instruction during an aggravated assault trial. *Id.* ¶¶ 18–23. We concluded that the instructions given created an unacceptable risk that the jury did not comprehend the necessity of finding that the defendant intended to cause serious bodily injury. *Id.* ¶¶ 22–23. We upheld the conviction, however, because we determined that there was not a reasonable probability that a correctly instructed jury would have reached a different verdict. *Id.* ¶ 28. The only logical conclusion to be drawn from the verdict in *Hutchings* was that the jury had rejected the defendant's testimony and accepted the victim's testimony that the defendant kicked in the victim's door, grabbed the victim by the neck and chocked her, broke her hand by slamming it against a hard object, and stated that he was going to kill her. *Id.* ¶¶ 3, 27 & n.11. Given the "totality of the evidence before the . . . jury," *Strickland*, 466 U.S. at 695, the instructional error did not undermine our confidence in the outcome of the trial because a correctly instructed jury likely would have found that the defendant acted with the requisite mens rea, *Hutchings*, 2012 UT 50, ¶ 28.

¶55 We reached a similar conclusion in *State v. Powell*, 2007 UT 9, 154 P.3d 788 and *State v. Casey*, 2003 UT 55, 82 P.3d 1106. In both cases, defense counsel did not object to an erroneous instruction that the jury could find the defendant guilty of attempted murder if the defendant acted either intentionally or knowingly. *Powell*, 2007 UT 9, ¶¶ 17, 19; *Casey*, 2003 UT 55, ¶¶ 38–39. These instructions were in error because a defendant may only be convicted of attempted murder if the defendant acted intentionally; a knowing state of mind is insufficient. *Casey*, 2003 UT 55, ¶ 38. We nevertheless upheld the convictions in both *Powell* and *Casey*, holding that there was not a reasonable likelihood that the in-

structural error affected the verdict.[1] *Powell*, 2007 UT 9, ¶¶ 21–23; *Casey*, 2003 UT 55, ¶¶ 46–50.

¶56 *Powell* and *Casey* are factually similar to each other, leading this court to hold that the instructional error in each case was harmless for similar reasons. In *Powell*, the defendant twice pointed a gun at the victim's head and pulled the trigger, but the gun did not fire. 2007 UT 9, ¶¶ 3–4. As the defendant fled in a car, he noticed the loaded magazine clip for the gun lying on the floor and exclaimed, "That's why [it] didn't work!" *Id.* ¶ 5. In *Casey*, the defendant pointed a gun at the victim's head and pulled the trigger, but it misfired. 2003 UT 55, ¶ 5. The defendant then shot at the victim as she fled, but missed. *Id.* In both *Powell* and *Casey*, we reviewed the compelling evidence that the defendants intended to kill their victims and held that there was not a reasonable probability that a correctly instructed jury would have come to a different conclusion. *Powell*, 2007 UT 9, ¶ 23; *Casey*, 2003 UT 55, ¶¶ 49–50.

¶57 In summary, *Strickland* and Utah caselaw require courts to evaluate the totality of the evidence presented to the jury to determine the probability of a more favorable outcome for the de-

---

[1] The defendants in *Powell* and *Casey* did not raise a *Strickland* ineffective assistance of counsel argument. Instead, they asserted that this court should have reviewed the unpreserved instructional errors under the plain error doctrine, which requires the appellant to show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *Casey*, 2003 UT 55, ¶ 41 (internal quotation marks omitted); *accord Powell*, 2007 UT 9, ¶ 18. Because the third element of a plain error analysis is identical to the second step of a *Strickland* analysis, the reasoning of *Powell* and *Casey* regarding whether the instructional error affected the outcome of those cases is relevant to the question of prejudice at issue in this case. *See State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993) ("Th[e] prejudice test [for ineffective assistance of counsel] is equivalent to the harmfulness test we apply in determining plain error . . . .").

fendant if defense counsel had provided adequate representation and ensured that the jury had been properly instructed. A conviction should only be reversed if this probability of a more favorable result is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶58 In this case, Mr. Barela asserted that he was innocent because K.M. actively solicited a sexual encounter. *Supra* ¶ 5. Although the verdict demonstrates that the jury did not believe Mr. Barela's testimony, we must still evaluate the likelihood that a correctly instructed jury would have found that Mr. Barela lacked the required mens rea given K.M.'s version of what happened. *See Hutchings*, 2012 UT 50, ¶ 28 (evaluating the likelihood of a defense verdict if the jury had been correctly instructed where the jury had clearly rejected the defendant's testimony); *Powell*, 2007 UT 9, ¶ 23 (same).

¶59 K.M. testified that Mr. Barela had given her a massage on one occasion prior to the day she was sexually assaulted. The first massage was uneventful, and K.M. did not request Mr. Barela for the second massage. During the second massage, the parties did not engage in conversation. Close to the end of the massage, Mr. Barela began to massage K.M.'s inner thigh while she was lying on her back. This made K.M. uncomfortable. Before K.M. could formulate a response, and within "a matter of seconds" of massaging her inner thigh, Mr. Barela pulled her to the end of the table without saying anything, dropped his pants, and penetrated K.M.'s vagina with his penis. K.M. testified that "it happened very fast" and that "before [she] knew it," Mr. Barela had penetrated her. Mr. Barela ejaculated within about thirty seconds to a minute and pulled up his pants. He then said, "Okay, this concludes your massage," and left the room.

¶60 Given this evidence, it is highly probable that a properly instructed jury would have concluded that Mr. Barela knew that K.M. had not consented to sex when he penetrated her vagina with his penis. And it is even more likely that a jury would conclude that Mr. Barela acted with criminal recklessness. A person acts with a reckless state of mind when that person engages in conduct

> [r]ecklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and

unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

UTAH CODE § 76-2-103(3). Thus, the test for determining whether a criminal defendant acted recklessly involves both a subjective and an objective element. First, the defendant must subjectively be "aware of but consciously disregard[] a substantial and unjustifiable risk" that a particular circumstance exists or that a particular result will occur. *Id.* Second, in order to determine whether disregarding the risk was "unjustifiable," the fact-finder must measure the defendant's conduct against an objective, reasonable person standard.

¶61 According to K.M.'s testimony, which the jury found credible, Mr. Barela inserted his penis into the vagina of a client who was a near-stranger to him within a matter of seconds of massaging her inner thigh. K.M. did not indicate her consent to Mr. Barela's actions in any way or even engage in conversation with him. The most that can be said is that K.M. did not actively object to Mr. Barela massaging her inner thigh within seconds of his doing so.[2] Thus the question presented to a correctly instructed jury would have been (1) whether Mr. Barela was "aware of but conciusly disregarded a substantial and unjustifiable risk that" K.M. had not consented to sex and, if so, (2) whether Mr. Barela's assumption of the risk of being wrong about any con-

---

[2] In his brief before this court, the defendant focused on K.M.'s testimony that she was frozen with shock while she was being sexually assaulted, and that she did not do or say anything. This testimony, however, has no bearing on Mr. Barela's state of mind when he first inserted his penis into K.M.'s vagina. It is at this moment that Mr. Barela was guilty of rape if he acted with the requisite mens rea as to the absence of K.M.'s consent. Any events occurring after this moment are irrelevant to the question of whether Mr. Barela acted intentionally, knowingly, or recklessly.

jecture that K.M. had consented to sex under these facts[3] "constitute[d] a gross deviation from the standard of care that an ordinary person would exercise." *Id.*

¶62 Under this reckless state of mind standard, it is not reasonably probable that a correctly instructed jury would have acquitted Mr. Barela. When K.M. entered the establishment where Mr. Barela worked as a massage therapist, she did so as a paying client seeking a service at an established business. K.M. had no relationship with Mr. Barela other than that of a client, and she did not engage in flirtatious behavior or even friendly conversation with him. Although K.M. was required to undress and lie beneath a sheet, a reasonable massage therapist would not perceive this as an indication that K.M. consented to sex any more than a reasonable doctor would perceive a patient's state of undress as consent. Moreover, a reasonable massage therapist would not perceive the act of massaging the inner thigh of a client as an invitation for a sexual encounter in a place of business that is accepted when the client simply fails to object within a few seconds. In my view, a reasonable jury likely would find that Mr. Barela was aware of but consciously disregarded the risk that K.M. did not consent to sex. Moreover, a jury likely would not only find that Mr. Barela breached the standard of care that an ordinary massage therapist would observe by disregarding this risk, but also would conclude that any assumption that a client had consented to sex under these circumstances would be a gross deviation from this standard of care.

¶63 Similar to this court's holdings in *Hutchings*, *Powell*, and *Casey*, I conclude that the probability that a properly instructed jury would acquit Mr. Barela of rape is not sufficient to under-

---

[3] Mr. Barela did not testify that he believed K.M. had consented to sex given the version of events K.M. testified to. He testified only as to his belief that K.M. had consented given his version of events in which K.M. initiated a sexual encounter (a version clearly rejected by the jury). The State, however, bears the burden of proving Mr. Barela's culpable state of mind, and the absence of specific testimony regarding Mr. Barela's perception of whether K.M. had consented to sex under K.M.'s version of events does not affect my analysis.

mine my confidence in the verdict. I would, therefore, hold that Mr. Barela cannot satisfy the second step of the *Strickland* analysis, and I would affirm his conviction.

––––––––––––