2010 UT 49

**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Warren Steed JEFFS, Defendant and Appellant.**

**No. 20080408.**

Supreme Court of Utah.

July 27, 2010.

Rehearing Denied Dec. 14, 2010.

Mark L. Shurtleff, Att'y Gen., Laura Dupaix, Craig L. Barlow, Asst. Att'ys Gen., Salt Lake City, Brock R. Belnap, Ryan J. Shaum, St. George, for plaintiff.

Walter F. Bugden, Jr., Tara L. Isaacson, Salt Lake City, Richard A. Wright, Las Vegas, NV, for defendant.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Defendant Warren Jeffs was convicted of two counts of rape as an accomplice for his role in the compelled marriage of fourteen-year-old Elissa Wall to her nineteen-year-old first cousin, Allen Steed, and the resulting sexual intercourse between them. Jeffs appeals his convictions, arguing a variety of errors in the proceedings before the trial court. While we are unconvinced by the majority of Jeffs' arguments, we conclude that there were serious errors in the instructions given to the jury that deprived Jeffs of the fair trial to which all are entitled under our laws. We therefore reverse the convictions and remand for a new trial.

¶ 2 Recognizing the highly publicized nature of this case, we remind the parties, the

trial court, and observers, that the presumption of innocence guaranteed to all by our Constitution demands great care from the courts and those who prosecute on behalf of the people. As this state's court of last resort, we are not at liberty to accept less, nor could we, consistent with our oaths to support, obey, and defend the constitutions of this state and country.

## BACKGROUND

¶ 3 "On appeal, we review the record facts in a light most favorable to the jury's verdict." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (internal quotation marks omitted). Conflicting evidence is presented "only as necessary to understand issues raised on appeal." *Id.* We recite the facts of this case accordingly.

¶ 4 Elissa Wall was raised as a member of the Fundamentalist Church of Jesus Christ of Latter-day Saints ("FLDS Church"). As a follower of that religion, she was extensively exposed to the teachings of the defendant, Warren Jeffs ("Jeffs"), who is the son of, and the former first counselor to, then–FLDS leader Rulon Jeffs ("Rulon"). From the first through the sixth grade, Wall attended school at Alta Academy, a private FLDS school where Jeffs acted as a teacher and as the principal. Outside of school, Wall was further exposed to Jeffs' teachings through Sunday meetings, church literature, and recordings that were broadcast through her home on a speaker system and that she listened to on a personal cassette player.

¶ 5 Proper relationships between the sexes figured prominently in Jeffs' teachings. He taught that, prior to marriage, boys and girls were to treat each other as "snakes," avoiding all intermingling or social contact. Girls were to relax this standard only with their husbands after marriage. However, most FLDS girls, including Wall, received no instruction about anatomy or reproduction. Jeffs taught that girls would be trained in these matters by their husbands.

¶ 6 Jeffs' teachings also focused extensively on the importance of obedience. As "God on earth," the FLDS prophet and his counselors were to be obeyed completely and willingly. Failure to do so would result in forfeiture of spiritual salvation, loss of family and friends, denial of marriage, and removal from the FLDS community. In addition to obeying their church leaders, Jeffs taught that women should obey their husbands, who were their individual "priesthood heads."

¶ 7 Wall witnessed the consequences of failing to follow these teachings firsthand in 1999 when her father was deemed disobedient to FLDS leaders and had his family "stripped from him." Wall, her mother, and her siblings were removed from her father's home in Salt Lake City and sent to live with Fred Jessop, Rulon's then second counselor, in Hildale, Utah. Jeffs subsequently performed a ceremony marrying Wall's mother to Jessop as one of his plural wives.

¶ 8 The doctrine that God will reveal to the FLDS prophet which of his followers should be joined in marriage relationships is fundamental to the FLDS faith. Wall, therefore, expected that church leaders would arrange her marriage. But she was shocked when, in 2001, Jessop told her that the prophet had a "place of marriage" for her and that she was to prepare herself for that place. Wall, who was then only fourteen years old, objected because of her age, but Jessop again told her that she needed to prepare herself. When Wall asked who she was to marry, Jessop told her that it would be "revealed" to her later. A few days before the wedding, Jessop told her she would marry Allen Steed, her nineteen-year-old first cousin. Wall told Jessop she would not marry Steed, but Jessop told her she would have to discuss the matter with the prophet, Rulon, since it was he who had arranged the marriage.

¶ 9 Rulon had recently suffered a debilitating stroke and Jeffs was managing his affairs. Wall called Jeffs and arranged a meeting with Rulon. Jeffs was present when Wall spoke with Rulon. She told Rulon that she did not wish to be disobedient, but asked him to let her wait until she was at least sixteen to be married and to place her with

someone other than her cousin. Rulon told Wall, "Follow your heart, sweetie. Follow your heart." Wall understood this to mean that she would not have to marry Steed. Jeffs, however, told her afterwards, "The prophet wanted me to remind you that this is the right thing to do. And you will go forward with this." Later that day, Jessop, despite Wall's pleading, confirmed that her wedding to Steed would still take place.

¶ 10 Two of Wall's older sisters, both of whom were married to Rulon, tried to intervene on Wall's behalf. Jeffs was present during their conversation with Rulon. Rulon expressed concern over the arrangements, but Jeffs said that Jessop was "insisting that this happen because of who he is" and "[w]e would like to honor his request."

¶ 11 Knowing that she would no longer be welcome in Jessop's home and that she would have to give up her relationships with her mother and her siblings if she did not marry Steed, Wall felt she had no option but to go through with the marriage. In April 2001, Wall was taken to Caliente, Nevada, for the wedding. Jeffs performed the ceremony, throughout which Wall cried tears of despair and fear. When Jeffs asked her if she took Steed to be her husband, she hung her head and said nothing. Jeffs repeated the question, and again Wall did not answer. After a long silence, Jeffs asked Wall's mother to stand by Wall and hold her hand. Jeffs repeated the question a third time, and Wall's mother squeezed her hand. Finally, Wall answered, "Okay, I do." Jeffs told Steed he could kiss the bride, but Wall hung her head and shook it. Jeffs commanded, "Lisi, kiss Allen." Wall gave Steed "a peck on the lips," then dropped his hand. Jeffs rejoined Wall's and Steed's hands and pronounced, "Now go forth and multiply and replenish the earth with good priesthood children." Wall then ran from the room and locked herself in a bathroom. Although no marriage license had been obtained, Wall considered herself married to Steed, which made him her leader and "priesthood head."

¶ 12 During the honeymoon trip that followed, Steed began touching Wall sexually. Still ignorant of sex, Wall did not understand why he was touching her and was "terrified" and "horrified." She repeatedly asked Steed to stop, telling him that she hated him and did not want him to touch her. Two to three weeks after the wedding, Steed exposed his genitals to Wall at a park. She ran away from him crying and hid in her mother's room. She stayed in her mother's room until the early hours of the morning, hoping that Steed would go to sleep. When she returned to her own room, however, she found Steed sitting on the bed. Over Wall's extensive protests, Steed began to undress her. She broke away and fled back to her mother's room, where she stayed for several days. When Wall eventually returned to her own room, Steed told her, "It is time for you to be a wife and do your duty." Although Wall cried and begged him not to, Steed then had sexual intercourse with Wall. The first of the State's two charges against Jeffs is based on this act of intercourse.

¶ 13 In the late spring of 2001, Wall had another meeting with Jeffs. She told Jeffs that Steed was touching her and doing things that she "was not comfortable with and didn't fully understand." She begged Jeffs for a "release" from the marriage, the FLDS equivalent of a divorce. In response, Jeffs told Wall that she needed to "repent" and that she was not being "obedient ... [and] submissive." Instead of releasing her from the marriage, Jeffs told her that she "needed to go home and give [her]self to [Steed], who was [her] priesthood head and husband, mind, body, and soul and obey without any question." Within days of this meeting, Steed again had sexual intercourse with Wall. The second of the State's two charges against Jeffs is based on this act of intercourse. The relationship between Wall and Steed continued through September 2003, with sex sometimes occurring without Wall's consent and sometimes with her consent.

¶ 14 The State charged Jeffs with two counts of rape as an accomplice, a first degree felony, under Utah Code sections 76–2–202 and 76–5–402 (2008). Following a preliminary hearing, Jeffs was bound over for

trial. A jury convicted him as charged. Jeffs moved to arrest judgment, alleging that the evidence was insufficient to support his convictions. The trial court denied the motion and sentenced Jeffs to two consecutive prison terms of five years to life. Jeffs moved for a new trial, arguing that the court had erred in seating an alternate juror after deliberations had begun. The court denied this motion on the basis of invited error. This appeal followed. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(I) (2008).

## ANALYSIS

¶ 15 Jeffs raises seven issues that he claims invalidate either the jury verdict or the resulting sentences. Jeffs argues that: (1) the accomplice liability and consent instructions given to the jury were erroneous, (2) the trial court erred by failing to instruct the jury that it must reach a unanimous decision on whichever of the prosecution's theories supported its finding that the victim did not consent, (3) there was insufficient evidence to sustain Jeffs' convictions, (4) there was insufficient evidence that Jeffs enticed Wall into a sexual relationship with Steed, (5) the "enticement" language of Utah Code section 76–5–406(11) is unconstitutionally vague, (6) the trial court erred in denying Jeffs' motion for a new trial because the court reconstituted the jury after deliberations had begun, and (7) the trial court erred in imposing consecutive sentences. We agree with Jeffs that the consent instructions given to the jury were erroneous and warrant a reversal of his convictions. Accordingly, we need not reach the remainder of his claims. We do address, however, Jeffs' argument with respect to the correctness of the jury instruction on accomplice liability to give guidance to the trial court on remand.

## I. THE JURY INSTRUCTIONS ON CONSENT AND ACCOMPLICE LIABILITY WERE ERRONEOUS

¶ 16 Jeffs contends that instructions given to the jury on the issues of consent and accomplice liability were erroneous. Specifically, Jeffs argues that the instruction on consent erroneously focused the jury on Jeffs' relationship with Wall rather than on Steed's relationship with Wall. With respect to the accomplice liability instruction, Jeffs argues that the trial court erred by refusing to instruct the jury that Jeffs could not be found guilty as an accomplice to rape unless Jeffs intended that Steed engage in nonconsensual sexual intercourse with Wall. Claims of erroneous jury instructions present questions of law that we review for correctness. *State v. Miller*, 2008 UT 61, ¶ 13, 193 P.3d 92. We therefore review the instructions given to the jury without deference to the trial court. Before turning to the actual jury instructions themselves, however, we outline the law applicable to the State's charges against Jeffs.

### A. The Charges Against Jeffs

¶ 17 The State charged Jeffs with two counts of rape as an accomplice. The first count was alleged to have occurred shortly after Wall and Steed were married when they first had intercourse. The second count was alleged to have occurred after Jeffs refused to "release" Wall from her marriage to Steed and counseled her to "give herself to [Steed], . . . mind, body and soul."

¶ 18 These charges implicate three different sections of the Utah Code: (1) the rape statute found in section 76–5–402, (2) the consent statute found in section 76–5–406, and (3) the accomplice liability statute found in section 76–2–202. We begin our discussion with the rape statute.

¶ 19 "A person commits rape when the actor has sexual intercourse with another person without the victim's consent." Utah Code Ann. § 76–5–402(1) (2008). A rape can be committed "whether or not the actor is married to the victim." *Id.* § 76–5–402(2).

¶ 20 To establish the required lack of consent, the State relied on three separate subsections of section 76–5–406, the statute that defines the circumstances under which an act of sexual intercourse is deemed to be without

the victim's consent. The relevant sections provide:

> An act of sexual intercourse ... is without consent of the victim under any of the following circumstances:
>
> (1) the victim expresses lack of consent through words or conduct;
>
> . . .
>
> (10) the victim is younger than 18 years of age and at the time of the offense the actor was the victim's parent, stepparent, adoptive parent, or legal guardian or occupied a position of special trust in relation to the victim as defined in Subsection 76–5–404.1(4)(h);
>
> (11) the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim to submit or participate
>
> . . . .

*Id.* §§ 76–5–406(1), (10)-(11).

¶ 21 Because the sexual intercourse on which the charges were based was between Wall and Steed, rather than between Wall and Jeffs, the accomplice liability statute also comes into play. It provides: "Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." *Id.* § 76–2–202.

¶ 22 Therefore, to convict Jeffs as an accomplice to rape, the State was required to establish that Jeffs, acting with the requisite mental intent, solicited, requested, commanded, encouraged or intentionally aided Steed to have nonconsensual sexual intercourse with Wall. We analyze the jury instructions in light of these statutes to determine whether they accurately stated the State's burden. We begin with the consent instruction and then turn to the accomplice liability instruction.

**B. The Consent Instruction Was Erroneous**

■ ¶ 23 We first address Jeffs' claim that the jury instruction regarding consent was erroneous. Jeffs argues that the instruction erroneously focused the jury on Jeffs' actions and position of special trust, rather than on Steed's, for the purpose of determining whether Wall consented to sexual intercourse. We agree that the consent instruction was erroneous.

¶ 24 As previously indicated, the State identified three different sections of the consent statute pursuant to which it argued that the sexual intercourse between Wall and Steed was without Wall's consent. First, under subsection (1) of the consent statute, the State argued that Wall showed "express[ ] lack of consent through words or conduct." *Id.* § 76–5–406(1). As evidence of this lack of consent, the State relied on Wall's pleas to Jeffs not to make her marry Steed, her repeated refusal during the marriage ceremony to answer "I do," her reluctance to kiss Steed, and her running from the room and locking herself in the bathroom after the ceremony. The State additionally argued that Wall continued to show an express lack of consent after the ceremony by attempting to avoid physical contact with Steed, crying, and begging Steed not to have sexual intercourse with her.

¶ 25 Second, under subsection (10), the State argued that Wall was under eighteen years of age and that Jeffs was in a "position of special trust" in relation to Wall. *Id.* § 76–5–406(10). As used in subsection (10), " 'position of special trust' means [a] position occupied by a person in a position of authority, who, by reason of that position is able to exercise undue influence over the victim, and includes, but is not limited to, a ... religious leader...." *Id.* § 76–5–404.1(4)(h). At trial, the State argued that Jeffs occupied a position of special trust in relation to Wall because he was her religious leader, and as such had near absolute control over her, her family, and her entire community. Further, he used his position as a religious leader to

put Wall in a circumstance where she had no choice but to submit to unwanted sexual intercourse.

¶ 26 Third, under subsection (11), the State argued that Wall was over fourteen years of age but under eighteen years of age, that Jeffs was more than three years her senior, and that Jeffs used psychological and religious manipulation to entice Wall to submit to unwanted sexual intercourse. *See id.* § 76–5–406(11). To support this theory, the State cited Jeffs' actions of convincing Wall to enter into the marriage, his direction during the wedding ceremony that Wall and Steed "multiply and replenish the earth," and his later refusal to release her from the marriage coupled with his counsel that she "go home and give [her]self to [Steed] ... mind, body and soul."

¶ 27 The instruction given to the jury reflected the State's three theories. It stated the following:

> An act of sexual intercourse is without consent of a person under any, all, or a combination of the following circumstances:
>
> 1. The person expresses lack of consent through words or conduct; or
>
> 2. The person was 14 years of age or older, but younger than 18 years of age, and the actor was more than three years older than the person and enticed the person to submit or participate; or
>
> 3. The person was younger than 18 years of age and at the time of the offense the actor occupied a position of special trust in relation to the person.

¶ 28 In order to clarify the State's second and third theories, the court also gave the following instructions:

> In order to find the victim's lack of consent because the victim is younger than 18 years of age and at the time of the offense that the *Defendant* occupied a position of "special trust" in relation to Elis[s]a Wall you must be convinced that the State has proven beyond a reasonable doubt that

the offense was committed by a person who occupied a position of special trust in relation to the victim.

> . . .
>
> In order to find that Elissa Wall was enticed the State must prove beyond a reasonable doubt that the *Defendant* lured or induced a person to submit to or to participate in an act of sexual intercourse. (Emphasis added.)

 ¶ 29 Jeffs argues that it was impermissible for the court to focus the jury on his own position of special trust and on his own enticing actions in determining whether the intercourse between Steed and Wall was consensual. Rather, Jeffs contends that the jury should have been asked to consider whether *Steed* was in a position of special trust and whether *Steed* enticed Wall. We agree with Jeffs.

¶ 30 While the jury instruction appears to track the statutory language, the instruction erroneously interprets the statute's use of the term "actor," as used in Utah Code sections 76–5–406(10) and (11), to refer to the defendant, Jeffs, rather than to Steed. Those sections provide that the intercourse will be deemed to be nonconsensual if "the victim is younger than 18 years of age and at the time of the offense the *actor* ... occupied a position of special trust in relation to the victim," or if "the victim is 14 years of age or older, but younger than 18 years of age, and the *actor* is more than three years older than the victim and entices or coerces the victim to submit or participate ...." *Id.* § 76–5–406(10)–(11) (emphases added). As evidenced by the additional clarifying instruction, the State interprets the term "actor" to mean the "defendant."

 ¶ 31 We conclude that the State's interpretation is erroneous. In interpreting a statute, we look to its plain language. *Dale T. Smith & Sons v. Utah Labor Comm'n,* 2009 UT 19, ¶ 7, 208 P.3d 533. We read statutory provisions literally, unless such a reading "would result in an unreasonable or inoperable result." *State v. Jeffries,* 2009 UT

57, ¶ 7, 217 P.3d 265. And "'we assume the legislature used each term advisedly and in accordance with its ordinary meaning.'" *Id.* (quoting *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276). "'[E]ach part or section should be construed in connection with every other part or section so as to produce a harmonious whole.'" *State v. Moreno*, 2009 UT 15, ¶ 10, 203 P.3d 1000 (quoting *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099).

¶ 32 "Actor" is defined by statute as "a person whose criminal responsibility is in issue in a criminal action." Utah Code Ann. § 76–1–601(2). The person whose criminal responsibility is at issue in a criminal action will usually be the defendant. For example, under the rape statute, "[a] person commits rape when the actor has sexual intercourse with another person without the victim's consent." *Id.* § 76–5–402(1). Under the rape statute, therefore, the "actor" must be the person who has nonconsensual sexual intercourse with the victim or, in other words, the defendant who is being prosecuted for an act of rape.

¶ 33 But section 76–1–601 also provides that its definition of "actor" does not apply to those statutes that provide otherwise. And we conclude that the consent statute provides otherwise. The opening words of section 76–5–406 specifically indicate that the section discusses the "act of sexual intercourse" and the circumstances under which that act occurs without consent. *Id.* § 76–5–406. Because the act at issue is the act of sexual intercourse, the term "actor" as used in subsections (10) and (11) must necessarily relate back to the underlying "act of sexual intercourse." And the term "actor" must refer to the person who engages in the act at issue. Therefore, the "actor" is the person who engages in sexual intercourse. To read the statute otherwise would require us to sever the term "actor" from the context of the surrounding provisions. Because Jeffs did not engage in sexual intercourse with Wall, it was erroneous for the jury instructions to equate the term "actor" with the term "defendant" in instructing the jury as to whether the State had met its burden of proving that the sexual intercourse between Steed and Wall was nonconsensual.

¶ 34 Our conclusion that the term "actor" refers to the individual engaging in the act of intercourse is consistent with the principle that, in order for accomplice liability to arise, there must be an underlying offense. Only after there is a determination that an offense has been committed can the law impose liability on another party who "solicit[ed], request[ed], command[ed], encourag[ed], or intentionally aid[ed]" in the commission of that offense. *Id.* § 76–2–202. To determine whether a rape has occurred, section 76–5–406 is applied and a determination is made of whether there was sexual intercourse without consent. The question of accomplice liability cannot enter the equation until after a determination has been made that a crime has been committed. As a result, the use of the term "actor" under the consent statute can refer only to the person engaging in the act of intercourse.

¶ 35 To construe the statute otherwise would lead to absurd results. For example, if the term "actor" as used in subsection (10) of the consent statute is deemed to refer to the defendant in an accomplice-liability case, a parent who encourages his pregnant minor daughter to marry the adult father of her unborn baby would satisfy the requirements of that subsection, thereby rendering any further intercourse between the couple nonconsensual and the parent guilty of a first degree felony as an accomplice to rape.

¶ 36 In summary, we hold that the term "actor" as used in subsections (10) and (11) of Utah Code section 76–5–406 refers to the person who engaged in the act of sexual intercourse. As a result, those subsections could not be applied to Jeffs. Only Steed's position of special trust or Steed's efforts of enticement were relevant in determining whether Wall consented to sexual intercourse. Because the consent instructions told the jury that defendant Jeffs' position of special trust and defendant Jeffs' enticement of Wall could give rise to a lack of consent, they were erroneous.

¶ 37 Having concluded that the jury instructions on consent were erroneous, we must consider whether they require reversal of Jeffs' convictions. "[T]o reverse a trial verdict, [we] must find not a mere possibility, but a reasonable likelihood that the error affected the result." *Cheves v. Williams*, 1999 UT 86, ¶ 20, 993 P.2d 191 (quoting *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993)). We find such a likelihood here.

¶ 38 The consent instruction given to the jury stated: "An act of sexual intercourse is without consent of a person under any, all, or a *combination of* the following circumstances ...." (emphasis added). It then listed the State's three theories of non consent, two of which we have held to be erroneous. Because no special verdict form was employed at trial, the jury was not required to indicate the basis for its finding that the intercourse between Steed and Wall was nonconsensual. We therefore cannot determine with certainty whether Jeffs was convicted on the basis of the one valid theory, the two erroneous theories, or on some combination of the three. And because there was no real dispute at trial that Jeffs was in a position of special trust with respect to Wall, a theory we have held to be erroneous, it is highly likely that Jeffs was convicted on the basis of an erroneous theory. Such a likelihood requires reversal of his convictions and a remand for a new trial.

## C. The Accomplice Liability Instruction Was Erroneous

¶ 39 Because we reverse Jeffs' convictions on the basis of the erroneous consent instructions, his remaining claims of error are not dispositive and we need not reach them. We nevertheless address his claim that the trial court erroneously instructed the jury with regard to the mens rea element of the accomplice liability statute in order to guide the trial court on remand. *See IHC Health Servs., Inc. v. D & K Mgmt.*, 2003 UT 5, ¶ 10, 73 P.3d 320 (considering nondispositive argument for guidance of the parties on remand).

¶ 40 Jeffs asserts that he could not be convicted as an accomplice to the rape of Wall unless the State proved that he intended that Steed rape Wall. At trial, Jeffs unsuccessfully requested a jury instruction stating that, in order to reach a conviction, the jury must find that Jeffs "intended that the result of his conduct would be that Allen Steed rape Elissa Wall." We agree with Jeffs that he was entitled to the requested instruction.

¶ 41 The trial court instructed the jury on party liability as follows:

> To convict Warren Jeffs as an accomplice to the crime of rape, you must find from the evidence, beyond a reasonable doubt, all of the following elements of that crime:
>
> 1. That the defendant, Warren Jeffs:
>
> a. intentionally, knowingly, or recklessly solicited, requested, commanded, or encouraged another—
>
> I. to have sexual intercourse
>
> ii. with Elissa Wall without consent; or
>
> b. intentionally aided another—
>
> I. to have sexual intercourse
>
> ii. with Elissa Wall without consent; and
>
> 2. Allen Steed had sexual intercourse with Elissa Wall without consent.

¶ 42 Jeffs argues that one cannot be found guilty as an accomplice unless he has the required mental state for the underlying crime to be committed. In this case, Jeffs argues that the jury was not adequately instructed of this requirement. The State disagrees, pointing out that the instruction properly informed the jury of the mental state required which, in the case of rape, is an "intentional, knowing or reckless mental state." *State v. Calamity*, 735 P.2d 39, 43 (Utah 1987); *see also* Utah Code Ann. § 76–2–102 ("[W]hen the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility."). The problem, however, is that the instruction

only indicated that the reckless, knowing, or intentional mental state attached to the actions of "solicited, requested, commanded, or encouraged," not to the underlying criminal conduct of rape.

¶ 43 We addressed the requisite mental state under the accomplice liability statute in *State v. Briggs.* 2008 UT 75, 197 P.3d 628. There, we stated that "[a]n accomplice must . . . have the intent that the underlying offense be committed." *Id.* ¶ 14. "Intent," as used in this context, is a legal term of art that means "[t]he state of mind accompanying an act." *Black's Law Dictionary* 881 (9th ed. 2009). It should not be confused with the mental state designated as "intentionally." *See* Utah Code Ann. § 76–2–103(1). To restate the essential principle, "accomplice liability adheres only when the accused acts with the mens rea to commit the principal offense." *State v. Calliham,* 2002 UT 86, ¶ 64, 55 P.3d 573.

¶ 44 The accomplice liability statute reflects this principle in the requirement that the defendant act "with the mental state required for the commission of [the] offense." Utah Code Ann. § 76–2–202. This mandates that the defendant, in this case one who acts as an accomplice to rape, undertake his actions intentionally, knowingly, or recklessly. But intentionally, knowingly, or recklessly in regard to what? The obvious answer is that he must act intentionally, knowingly, or recklessly as to the results of his conduct. And in order for criminal liability to attach, the results of his conduct must be a criminal offense.

 ¶ 45 This principle is further clarified by the statutory definitions of the possible "mental state[s] required for the commission of" rape. *Id.* A person acts "[i]ntentionally . . . with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 76–2–103(1). Under this mental state, the accomplice desires to cause rape. "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 76–2–103(2). Under this mental state, the accomplice knows that his conduct will most likely cause rape. Finally, a person acts "[r]ecklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 76–2–103(3). Under this mental state, the accomplice recognizes that his conduct could result in rape but chooses to proceed anyway. Thus, in specifying that the accomplice act with the mental state required for the commission of the underlying offense, the accomplice liability statute clearly contemplates that the accomplice is aware of, at a minimum, the substantial and unjustifiable risk that his actions will result in the commission of a crime—in this case rape—by another person.

¶ 46 The State urges an alternate interpretation of the accomplice liability statute, under which one could act intentionally, knowingly, or recklessly in the abstract and incur criminal liability if his actions resulted in soliciting, requesting, commanding, encouraging, or intentionally aiding another in committing a crime. We reject this alternate interpretation because it would sweep in too much innocent behavior. Taken to its logical extreme, this interpretation could result in accomplice liability attaching to a person who leaves his house unlocked, leading to the theft of his own personal property inside the house. But we have been careful to avoid expanding the law to this extent.

¶ 47 In *State v. Comish,* we held that a security officer who purchased marijuana in a sting operation could not be considered an accomplice for testimonial purposes because "[u]nder [the] statute and under the generally accepted meaning of the term, . . . 'accomplice' . . . does not include a person who . . . merely provides an opportunity for one who is disposed to commit a crime." 560 P.2d 1134, 1136 (Utah 1977).

¶ 48 And we have also held that even less innocent behaviors do not appropriately categorize an individual as an accomplice if that individual had no intention that the underlying crime be committed. In *State v. Schreuder*, for example, we held that a man who knew that a woman wanted to kill her father and who concealed the murder weapon after the crime was committed was not an accomplice. 726 P.2d 1215, 1220 (Utah 1986). In so holding, we stated that "[p]rior knowledge does not make a person an accomplice when that person does not have the mental state required" for the underlying crime. *Id.* While there were clearly other crimes with which the defendant in *Schreuder* could have been charged, "there was insufficient evidence to establish that he . . . had the mental state required to commit the crime [of murder]," and thus he was not an accomplice. *Id.*

¶ 49 We clarify that an accomplice need not act with the same intent, or mental state, as the principal. "Party liability under section 76–2–202 does not require that the persons involved in the criminal conduct have the same mental state." *State v. Alvarez*, 872 P.2d 450, 461 (Utah 1994). "A defendant can be criminally responsible for an act committed by another, but the degree of his responsibility is determined by his own mental state in the acts that subject him to such responsibility, not by the mental state of the actor." *State v. Crick*, 675 P.2d 527, 534 (Utah 1983) (emphasis omitted). "[I]t is not necessary for the accomplice to have the same intent that the principal actor possessed as long as the accomplice intended that an offense be committed." *State v. Briggs*, 2008 UT 75, ¶ 14, 197 P.3d 628.

¶ 50 Jeffs was also entitled to his requested instruction for the independent reason that it was necessary to clarify the "intentionally aids" portion of the accomplice liability statute. In those cases where the defendant solicits, requests, commands, or encourages another to commit an offense, the accomplice liability statute incorporates the default mental state of recklessly, knowingly, or intentionally. However, in those cases where the defendant is charged with aiding another in the commission of the offense, the accomplice liability statute requires that the defendant's aiding be "intentional." *See* Utah Code Ann. § 76–2–202.

¶ 51 While the jury instruction used in this case did incorporate the phrase "intentionally aided," it was nevertheless confusing with respect to the issue of intent. As we explained in *Briggs*, "To show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense." 2008 UT 75, ¶ 13, 197 P.3d 628. This is precisely the alternate instruction that Jeffs requested, but was denied.

¶ 52 Without Jeffs' proposed instruction as to intent, the jury could have convicted Jeffs if it found that Jeffs "intentionally" did some act, and such intentional act *unintentionally* "aided" Steed in having nonconsensual sexual intercourse with Wall. For example, even if Jeffs never intended for Steed to rape Wall, the jury instruction allowed for the possibility that he would be found guilty simply because he intentionally performed the marriage ceremony and the existence of the marriage aided Steed in raping Wall. For this reason, the jury instruction was also erroneous.

## CONCLUSION

¶ 53 Because we hold that the trial court's instructions to the jury regarding lack of consent were in error, we reverse Jeffs' two convictions of rape as an accomplice and remand for a new trial.

¶ 54 We regret the effect our opinion today may have on the victim of the underlying crime, to whom we do not wish to cause additional pain. However, we must ensure that the laws are applied evenly and appropriately, in this case as in every case, in order to protect the constitutional principles on which our legal system is based. We

must guarantee justice, not just for this defendant, but for all who may be accused of a crime and subjected to the State's power to deprive them of life, liberty, or property hereafter.

¶ 55 Chief Justice DURHAM, Associate Chief Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

¶ 56 Justice WILKINS sat for oral argument; however, due to his retirement from this court, did not participate herein.