2021 UT 45

IN THE

# SUPREME COURT OF THE STATE OF UTAH

THE STATE OF UTAH,
*Respondent,*

*v.*

MATTHEW GORDON EYRE,
*Petitioner.*

No. 20190977
Heard April 14, 2021
Filed August 12, 2021

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Royal I. Hansen
No. 161909443

Attorneys:

Andrea J. Garland, Salt Lake City, for petitioner

Sean D. Reyes, Att'y Gen., Lindsey Wheeler, Asst. Solic. Gen., for respondent

JUSTICE HIMONAS authored the opinion of the Court in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1 "No problem of criminal law is of more fundamental importance or has proved more baffling through the centuries than the determination of the precise mental element or *mens rea* necessary for crime." Francis Bowes Sayre, *Mens Rea*, 45 HARV. L. REV. 974, 974 (1932) (footnote omitted). Today, we address whether a jury instruction detailing the *mens rea*[1] required to convict under an

---

[1] For those who don't speak Latin, *mens rea* means "guilty mind." *Mens rea*, BLACK'S LAW DICTIONARY (11th ed. 2019). And for those

(continued . . .)

accomplice-liability theory was erroneous and, if so, whether a convicted defendant's trial counsel provided ineffective assistance of counsel in failing to object to it.

¶2   Accurately conveying the required mental element of a crime in jury instructions is right up there in "fundamental importance" alongside accurately determining the mental element. This importance is on display today as we conclude the defendant, Matthew Eyre, has been convicted and incarcerated based on an erroneous *mens rea* jury instruction—an instruction to which trial counsel should have objected. And this failure to object prejudiced Eyre as competing factual scenarios created the possibility that he was convicted without meeting the requisite *mens rea*. Accordingly, we reverse the court of appeals on the jury instruction issue, vacate Eyre's conviction, and remand for a new trial.

## BACKGROUND

¶3   On the morning of August 28, 2016, Daniel Simon and Natanni Xoumphonphackdy were parked in Simon's Dodge Challenger near 300 South 600 West. Nearby, Matthew Gordon Eyre, Jesse Ray Rakes, and Michael Sean Polk were sitting in a PT Cruiser. When Rakes noticed the Challenger, he allegedly told Eyre and Polk that he wanted to steal it and said he was going to ask for a jump start.

¶4   Rakes approached the Challenger and asked Simon for help jump-starting the Cruiser. Simon agreed to help and moved his vehicle so that it was "nose to nose" in a "V" shape to the Cruiser.

¶5   Simon then got out of his Challenger, lifted up the hood, and stood near his passenger window between the two vehicles. Rakes also propped up the hood of his car and joined Simon between the vehicles, and the two engaged in small talk. By this point, Eyre and Polk had also exited the Cruiser and began to look for jumper cables in the back of the Cruiser. Feeling like it was taking too long, Simon asked Rakes if they had cables. Rakes then lifted his shirt, flashing a pistol in his waistband, and said something to the effect of: "You know what this is. We are taking everything." Notably, it is unclear if Rakes used the singular first-person pronoun "I" or the plural "we." Rakes also threatened to "pistol whip" Xoumphonphackdy if she did not exit the Challenger.

---

who don't speak legalese, *mens rea* means the mental element of a crime.

¶6    At this point, Xoumphonphackdy discretely handed Simon a pistol through the car window. As Simon attempted to back away from Rakes, Rakes pursued, "drawing his gun in [Simon's] direction." Simon then fatally shot Rakes. Eyre fled the scene. A collision occurred between the Challenger and Cruiser, which resulted in the Cruiser flipping over.

¶7   Eyre was arrested shortly after the incident and subsequently interviewed. No gun was found on him. In his interview, Eyre gave three accounts of the incident. Initially, Eyre denied being present, said he "did not shoot anybody," and said he did not "see anybody get shot." He said he only "heard the sirens" and "heard a shot." But then Eyre admitted to being in the car with Rakes and Polk when Rakes had asked Simon for a jump start. He also admitted to getting out of the car to look for cables upon Rakes's command. After finding no cables, Eyre said he walked around the car where he saw Rakes give chase to Simon before Simon shot Rakes.

¶8    After learning Rakes had died, Eyre alleged that it was Rakes's idea to steal Simon's car. He said that when Rakes initially saw the Challenger, Rakes told Eyre and Polk that he was going to take it. Eyre claimed that he told Rakes to leave them alone, that it was a "dumb ass idea," that he did not want to drive a stolen vehicle, and said, "I won't do it." Eyre said his refusal angered Rakes, who quickly dismissed Eyre's protest, stated he was going to ask for a jump start, and got out of the Cruiser. At this point, Eyre claimed that Rakes was "running the show" and that he and Polk got out to look for cables in the back of the Cruiser. Eyre claimed that, immediately prior to the shooting, he walked up to Rakes and Simon and indistinctly heard Rakes say "something" to Simon. He then saw Rakes give chase to Simon before Simon shot Rakes. When later asked about the "plan," Eyre stated that they had no plan.

¶9    In addition to Eyre's claims that he did not want to commit the robbery, there is conflicting testimony as to Eyre's actions during the robbery. Some testimony indicates that Eyre had approached Rakes and Simon between the cars and had also brandished a gun. But both Eyre and, notably, Xoumphonphackdy testified that Eyre did not engage in conversation with Simon or Rakes and did not possess or flash a gun. Xoumphonphackdy also testified that Eyre did not "do anything to further [the] crime." In addition to telling the police he was not armed during the robbery, Eyre claimed that he was unaware whether Rakes was armed.

¶10 Eyre was charged as an accomplice to aggravated robbery, a first degree felony, under a theory of accomplice liability. The State argued that Eyre acted as an accomplice by allegedly pretending to look for jumper cables and by allegedly threatening Simon with a gun.

¶11 A jury trial was held in October 2017. At trial, the jury was given three instructions on accomplice liability. Defense counsel stipulated to the inclusion of these instructions.

¶12 The jury found Eyre guilty, and he was sentenced to an indeterminate prison term of 10 years to life. He timely appealed on multiple grounds. Relevant to our determination today, Eyre argued that jury Instruction No. 40 was erroneous and trial counsel was deficient in failing to object to it. The court of appeals affirmed the conviction, concluding "that the instructions as a whole adequately instructed the jury on accomplice liability for aggravated robbery" and that trial counsel's performance was thus not deficient. *State v. Eyre*, 2019 UT App 162, ¶ 21, 452 P.3d 1197. Eyre petitioned for a writ of certiorari, which this court granted. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶13 "On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standard of review used by the court of appeals. We review the court of appeals' decision for correctness." *Prinsburg State Bank v. Abundo*, 2012 UT 94, ¶ 10, 296 P.3d 709 (citation omitted). Further, "[c]laims of erroneous jury instructions present questions of law that we review for correctness." *State v. Jeffs*, 2010 UT 49, ¶ 16, 243 P.3d 1250.

¶14 When we review a jury verdict, we typically "examine the evidence and all reasonable inferences in a light most favorable to the verdict." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565. This standard of review, however, is not helpful for us today, as we are not aware of which version of events the jurors accepted in reaching a guilty verdict, and all conflicting versions of the event could have led a reasonable juror to convict under an instruction that erroneously allows for a lesser *mens rea*. As such, we examine the evidence of all factual scenarios presented to the jury upon which the jury could have convicted under the erroneous instruction.

## ANALYSIS

¶15 Though Eyre argues for reversal based on three distinct legal theories, we conclude that we need only address one in order to dispose of this case: whether the court of appeals erred in concluding that trial counsel was not deficient in failing to object to jury Instruction No. 40.[2] In short, we agree with Eyre's argument. We begin our analysis with an explanation of the *mens rea* requirements under a theory of accomplice liability. We then turn our analysis to Eyre's ineffective assistance of counsel claim, finding that no reasonable attorney would have agreed to the instruction and that trial counsel's deficient performance prejudiced Eyre.

### I.   ACCOMPLICE LIABILITY AND *MENS REA*

¶16 As anyone who has sat through the first day of an introductory course on criminal law knows, *mens rea* (or mental state) is typically a requisite of criminality. *See, e.g., State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 ("A mens rea element is an essential element of [an] offense." (alteration in original) (citation omitted)(internal quotation marks omitted)); *State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 ("[O]ur criminal code requires proof of mens rea for each element of a non-strict liability crime."); UTAH CODE § 76-2-102 ("Every offense not involving strict liability shall require a culpable mental state . . . ."). But while most offenses require a showing of only one culpable mental state, accomplice liability requires at least two.

¶17 This branched *mens rea* requirement is codified in the Utah accomplice liability statute. The statute provides: "Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." UTAH CODE § 76-2-202. The first *mens rea* element—"[e]very person, acting with the mental state

---

[2] Eyre argues in the alternative that the court of appeals erred in holding both (1) that trial counsel invited error in allowing the jury to access a video-recorded police interview of Eyre during deliberations; and (2) that trial counsel was not deficient in failing to ensure the police interview video-recording was excluded from jury deliberations. Because we dispose of the case on Eyre's jury instruction argument alone, we do not address these additional arguments.

required for the commission of an offense"—is a reference to the underlying crime (including any additional *mens rea* requirements associated with aggravating factors, if present). *Id.* The second— "who . . . intentionally aids another person to engage in conduct which constitutes an offense"—must be understood as a reference to the defendant's mental state solely in regard to "aid[ing]" the commission of the underlying offense. *Id.*

¶18 A hypothetical helps to clarify this dual *mens rea* requirement. Imagine a defendant on trial for arson as an accomplice—while a co-felon set fire to a structure, this defendant drove the getaway car. The prosecution must show that the defendant's mental state meets the *mens rea* requirements of both the underlying crime *and* the accomplice liability statute. In our hypothetical, then, the prosecution must show that the defendant both intended that arson be committed (arson is a specific intent crime under Utah Code section 76-6-102(1)) *and* intentionally aided the co-felon in the commission of arson. Importantly, the two *mens rea* requirements are not always identical. If the defendant in our hypothetical were charged instead as an accomplice to reckless burning, for example, the *mens rea* of the underlying offense need only meet a recklessness standard, *see id.* § 76-6-104(1)(a), but the prosecution must still show that the defendant intentionally aided in the reckless burning offense.

¶19 Here, Eyre was charged with aggravated robbery under a theory of accomplice liability. Robbery requires a showing that "the person unlawfully and *intentionally* takes or attempts to take personal property in the possession of another . . . ." *Id.* § 76-6-301(1)(a) (emphasis added).[3] Aggravating factors include whether the defendant "uses or threatens to use a dangerous weapon[,] causes serious bodily injury upon another[, or] takes or attempts to take an operable motor vehicle" and require a *mens rea* of recklessness at a minimum. *Id.* § 76-6-302(1); *see id.* § 76-2-102 (providing that "when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal

---

[3] Robbery may also be committed with a knowing *mens rea* under Utah Code section 76-6-301(1)(b). However, the prosecution proceeded only under subsection 301(1)(a) (which requires an intentional *mens rea*), and the jury was never presented with the option to convict under the lesser *mens rea*.

responsibility").[4] In order to find a defendant similarly situated to Eyre guilty of aggravated robbery as an accomplice, then, a jury must find that the defendant both intended that aggravated robbery be committed *and* that he intentionally aided the commission of the aggravated robbery. However, a jury cannot properly make this finding if it has not been given proper instructions to do so. This jury instruction issue comes packaged in an ineffective assistance of counsel claim, which we now address.

## II. EYRE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL

¶20 We now turn to discuss whether Eyre received ineffective assistance of counsel when trial counsel failed to object to Instruction No. 40. To prevail on an ineffectiveness claim, an appellant must show that: (1) counsel performed deficiently and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, we first conclude that Instruction No. 40 was erroneous as to the proper *mens rea*, and we conclude it was unreasonable not to object to it given the centrality of *mens rea* to Eyre's defense, thus constituting deficient performance. Then, in rounding out Eyre's ineffective assistance of counsel claim, we further conclude that the failure to object to the erroneous instruction prejudiced Eyre. As such, we reverse the determination of the court of appeals on this issue, vacate Eyre's conviction, and remand for a new trial.

*A. Jury Instruction No. 40 Was Erroneous, and Trial Counsel Performed Deficiently in Failing to Object to It*

¶21 To determine whether trial counsel performed deficiently in failing to object to Instruction No. 40, we must decide if the instruction was, in fact, erroneous. This latter inquiry hinges on our application of *State v. Jeffs*, 2010 UT 49, 243 P.3d 1250, and its progeny. We first lay down the legal foundation of *Strickland*'s deficiency prong and our jury instruction jurisprudence, then apply them to the facts before us, ultimately finding that Instruction No. 40

---

[4] Because we conclude that the jury was improperly instructed with respect to the *mens rea* requirement for accomplice liability for robbery, we need not, and therefore do not, address the requisite *mens rea* to convert the robbery to aggravated robbery. In other words, as a matter of pure logic, you cannot get to aggravated robbery if there is no underlying simple robbery.

was erroneous and that failing to object to it constituted deficient performance.

### 1. *Strickland*'s deficiency prong

¶22 The first prong of the *Strickland* test asks whether the defendant has shown "that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment." *Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232. (citation omitted); *see Strickland*, 466 U.S. at 687. This prong sets a high bar for defendants, given the "strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment." *Archuleta*, 2011 UT 73 ¶ 39 (citation omitted). And it was with this presumption in mind, that we recently emphasized that "[t]he Sixth Amendment 'does not guarantee an errorless trial, and prevailing professional norms do not require perfection at trial.'" *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (citations omitted) (internal quotation marks omitted). Rather, as we put it in *State v. Ray*, 2020 UT 12, 469 P.3d 871, the ultimate question is always "whether counsel's assistance was reasonable *considering all the circumstances*." *Id.* ¶ 31 (emphasis added) (citation omitted). What's more, there is no such thing as per se deficient performance. *Id.* And with respect to the specific issue at hand, *Ray* makes plain that the failure to "object[] to an error" in an instruction "does not automatically render counsel's performance deficient." *Id.*; *see also id.* ¶ 36 ("Here, that means we must ask whether defining indecent liberties was sufficiently important under the circumstances that counsel's failure to argue for a clarifying jury instruction fell below an objective standard of reasonableness.").

### 2. Jury Instruction No. 40 was erroneous

¶23 We have previously opined on erroneous jury instructions in the context of accomplice liability. In *Jeffs*, we stressed the importance of presenting the jury with instructions that clearly establish the dual *mens rea* requirements under the accomplice liability statute. 2010 UT 49, ¶¶ 39–52. In that case, the defendant, a leader of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS), was charged and convicted of two counts of rape as an accomplice—the defendant had proselytized the teachings of the FLDS church (including plural marriage), performed a marriage between a fourteen-year-old girl and an older cousin (Allen Steed), and forced the girl to remain in the marriage despite her pleas. *Id.* ¶¶ 3–13. Thereafter, the girl was repeatedly raped by her cousin. *Id.*

¶ 13. At trial, the jury was provided with an instruction regarding Jeff's accomplice liability, which required the jury to find that

> 1. [T]he defendant, Warren Jeffs:
>
> a. intentionally, knowingly, or recklessly solicited, requested, commanded, or encouraged another—
>
> [i]. to have sexual intercourse
>
> ii. with [the victim] without consent; or
>
> b. intentionally aided another—
>
> [i]. to have sexual intercourse
>
> ii. with [the victim] without consent; and
>
> 2. Allen Steed had sexual intercourse with [the victim] without consent.

*Id.* ¶ 41. Notwithstanding the unsavory details of the crime, this court found the instruction "confusing with respect to the issue of intent," even though the instruction "did incorporate the phrase 'intentionally aided.'" *Id.* ¶ 51. The problem with the instruction was that, "even if Jeffs never intended for Steed to rape [the victim], the jury instruction allowed for the possibility that he would be found guilty simply because he intentionally performed the marriage ceremony and the existence of the marriage aided Steed in raping [the victim]." *Id.* ¶ 52. Such a finding would be in error. *Id.*; *see also State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 (holding that "failure to instruct the jury as to the required mens rea, when it is an element of the crime, is reversible error").

¶24 *Jeffs* is not a case about deficient performance, but it nonetheless highlights this court's perspective on dual *mens rea* jury instructions. *Jeffs* stands for the proposition that a jury instruction regarding *mens rea* in the accomplice liability setting is erroneous if it inspires confusion such that there is a possibility a jury would not apply both *mens rea* requirements or would apply a lesser *mens rea* than is required.

¶25 Since *Jeffs*, we have consistently applied its reasoning. Most recently, in *State v. Grunwald*, we agreed with the court of appeals' determination that a jury instruction was erroneous because the instruction "permitted the jury to convict [the defendant as an accomplice] based on a reckless mental state" when the underlying offense—aggravated murder—required a "knowing" or "intentional" mental state. 2020 UT 40, ¶¶ 33–34, 478 P.3d 1. And we

agreed with the court of appeals that failing to object to the erroneous instruction constituted deficient performance. *Id.* ¶ 20.[5]

¶26   Just as in *Jeffs* and *Grunwald*, the instructions provided to the jury that ultimately convicted Eyre were erroneous. Instruction No. 40 provided: "If you find beyond a reasonable doubt that: (1) the defendant intentionally, (2) solicited, requested, commanded, encouraged, or intentionally aided another to commit the offense, **AND** (3) the offense was committed, then you can find the defendant guilty of that offense." And just as in *Jeffs*, we find ourselves asking: "intentionally . . . in regard to what?" 2010 UT 49, ¶ 44. This instruction has no explanation as to the *mens rea* requirement of the underlying offense. And while aggravated robbery requires an intentional mental state with regard to the actual robbery,[6] *see* UTAH CODE § 76-6-301(1)(a), the use of the word

---

[5] In *State v. Barela*, we contemplated the adequacy of a *mens rea* jury instruction for rape. 2015 UT 22, ¶ 2, 349 P.3d 676. Like accomplice liability, the elements of rape include a dual *mens rea* requirement—a requirement as to the sexual intercourse and a separate requirement as to the victim's nonconsent. *Id.* ¶ 26. The instruction in *Barela* provided: "1. The defendant . . ., 2. Intentionally or knowingly; 3. Had sexual intercourse with [the victim]; 4. That said act of intercourse was without the consent of [the victim]." *Id.* ¶ 13. Much like in *Jeffs*, this instruction left unclear whether "intentionally or knowingly" also applied to the nonconsent element and, in fact, "implied that the mens rea requirement . . . applied *only* to the act of sexual intercourse." *Id.* ¶ 26. We determined, then, that the instruction's "implication was error." *Id.*

[6] Recall that the prong of the robbery statute that the State proceeded under in its case against Eyre requires intentional conduct, while the aggravating factors require an additional *mens rea* requirement of recklessness. *See supra* ¶ 19. Whether Eyre meets this recklessness standard for the aggravating factors is not at issue today. In contemplating the accuracy of jury instructions as a precursor to our *Strickland* analysis, we first address whether the instructions sufficiently instructed the jury to determine whether Eyre had the requisite intent that robbery be committed *and* whether he had the requisite intent to aid Rakes in the commission of the robbery. They did not. And given the import of *mens rea* to Eyre's defense, we must then determine whether it was objectively

(continued . . .)

"intentionally" in part (1) of Instruction No. 40 is situated such that it is coupled with "solicited, requested, commanded, encouraged" in part (2) and *not* with the underlying offense language of part (3), thus permitting the jury to convict without determining whether Eyre had the requisite *mens rea* for the underlying aggravated robbery offense. *See State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 (finding that, "by coupling the mens rea requirement directly with [one element of the offense], and by articulating the [other element] without any apparent counterpart requirement of mens rea," the instruction erroneously conveyed that the "mens rea requirement . . . applied *only* to the" first element). This instruction was therefore in error.

¶27 The State argues that even if Instruction No. 40 were erroneous (and it is), it was cured by Instructions Nos. 39 and 41. Instruction No. 39 provided in relevant part:

> Every person, acting with the mental state required for the commission of the offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.

And Instruction No. 41 provided in relevant part:

> Prior knowledge that a crime is about to be committed or is being committed does not make a person an accomplice, and thereby does not subject them to criminal prosecution unless that person has the mental state required to commit the crime and he solicits, requests, commands, encourages, or intentionally aids in the perpetration of the crime.

Indeed, these two instructions more clearly define the dual *mens rea* requirements under an accomplice liability theory because they provide that the defendant must have "the mental state required for the commission of the offense" (or "the mental state required to commit the crime") *and* must "intentionally aid[]" the commission of the offense. But when read in conjunction with Instruction No. 40, these instructions do not cure No. 40's error but rather instill more

---

reasonable, in light of the circumstances of Eyre's defense, not to object to the erroneous instructions. *See infra* part II.A.3.

confusion. Though correct, Instructions Nos. 39 and 41 contradict Instruction No. 40, which itself does not require the defendant to have had the requisite mental state for the underlying offense. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985) ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two [or more] irreconcilable instructions the jurors applied in reaching their verdict.").

3. Trial counsel performed deficiently

¶28 Our return to plain language of *Strickland* in *Scott*, 2020 UT 13, ¶ 36, and *Ray*, 2020 UT 12, ¶ 31, does not support the categorical approach to *mens rea* instructions that we once may have indicated. *See, e.g.*, *Barela*, 2015 UT 22, ¶ 27 ("[N]o reasonable lawyer would have found an advantage in understating the mens rea requirement . . . . There is only upside in a complete statement of the requirement of mens rea . . . ."). Instead, we adjudge counsel's conduct "on the facts of the particular case." *Ray*, 2020 UT 12, ¶ 31 (citation omitted).

¶29 Armed now with our jurisprudence regarding *mens rea* instructions for accomplice liability and the *Strickland* standard—as explained in *Scott* and *Ray*—we assess counsel's failure to object to jury Instruction No. 40 in the present case. We start with determining whether the deficiency in the instruction "was sufficiently important under the circumstances that counsel's failure to argue for a clarifying jury instruction fell below an objective standard of reasonableness." *Id.* ¶ 36. In this case, we conclude the deficiency in jury Instruction No. 40 was important and that failure to object or argue for a clarifying jury instruction did fall below an objective standard of reasonableness. Additionally, we look at whether the alleged error in instruction is germane or "pertinent to" the defense advanced at trial. *See id.* ¶ 38.

¶30 Instruction No. 40 was erroneous, and the confusion engendered by the contradiction between Instruction Nos. 39, 40, and 41 further supports this conclusion. Having concluded that both Instruction No. 40 and the instructions as a whole were erroneous for understating or inaccurately portraying the *mens rea* requirements for aggravated robbery as an accomplice, we conclude that trial counsel's failure to object to Instruction No. 40 constituted deficient performance. We see neither a reasonable strategy nor one offered that could explain trial counsel's failure to object, given that Eyre's defense hinged on a lack of intentionality as to the robbery. In the circumstances of this particular case, where *mens rea* is at issue and

the erroneous instruction allowed the jury to convict on a lesser showing, any reasonable lawyer would have objected to the inaccurate and incomplete statement.[7]

### B. Trial Counsel's Deficient Performance Prejudiced Eyre

¶31 Though Eyre has cleared the first hurdle in his ineffective assistance of counsel claim, the *Strickland* test requires him to clear one more. To prevail on an ineffective assistance of counsel claim, an appellant must also "present sufficient evidence to support 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'", 2011 UT 73, ¶ 40, 267 P.3d 232 (quoting *Strickland*, 466 U.S. at 694 (additional citations omitted)). We refer to this requirement as the prejudice prong. *See, e.g., Grunwald*, 2020 UT 40, ¶ 21.

---

[7] We take this opportunity to recommend that trial courts apply our Model Utah Jury Instruction on Party Liability, which accurately and clearly portrays the dual *mens rea* requirement. It provides:

> A person can commit a crime as a "party to the offense." In other words, a person can commit a criminal offense even though he or she did not personally do all of the acts that make up the offense. Before a person may be found guilty as a "party to the offense," you must find beyond a reasonable doubt that:
> 1. The person had the mental state required to commit the charged offense;
> AND
> 2. The person:
>     a. directly committed the offense; or
>     b. intentionally, knowingly, or recklessly solicited, requested, commanded or encouraged another person to commit the charged offense; or
>     c. intentionally aided another person to commit the charged offense;
> AND
> 3. The charged offense was committed either by that person or another person.

MUJI 2d CR403B (amended 2018) (citing UTAH CODE ANN. § 76-2-202). This instruction must be used in concert with model jury instruction CR403A, which defines the elements of the underlying offense.

¶32 Our recent jurisprudence provides ample guidance in determining prejudice in this particular context. "When applying *Strickland*'s prejudice analysis in the context of erroneous jury instructions, we must determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct." *Id.* ¶ 22. We have further clarified that

> [a] reasonable probability "is a probability sufficient to undermine [our] confidence in the outcome." To determine whether there is a reasonable probability of a different outcome, we must ask ourselves two questions: (1) did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings that would not have led to conviction had the instructions been correct? And, (2) if so, is there a *reasonable probability* that at least one juror based its verdict on those factual findings?

*Id.* (second alteration in original) (citation omitted). Importantly, we've noted that the term "'factual findings' does not refer to the jury's ultimate determinations" but rather "to the potential factual scenarios the jurors could have accepted while listening to the parties' respective version of the relevant events of the case." *Id.* ¶ 22 n.21. After identifying the factual scenarios under the first *Grunwald* factor, "we must determine whether there is a reasonable probability that, based on the totality of the evidence, a juror convicted the defendant based on . . . . an accepted version of events that would not have led to a conviction with a correct jury instruction." *Id.* ¶ 26.

¶33 This guidance is particularly helpful when, as here, the parties have provided very differing versions of the event regarding an alleged accomplice's mental state. In *Grunwald*, for example, the defendant claimed she was coerced at gunpoint to aid in a co-felon's offense, *id.* ¶ 9, while the State argued the defendant participated willingly and intentionally. *Id.* ¶ 11. A juror might accept one version over the other, or "conclude[] that the truth fell somewhere in between." *Id.* ¶ 22 n.21. And

> [i]f a juror determined, based on the version of events he or she accepted as true, that [the defendant] acted recklessly (but not knowingly or intentionally), then the jury would not have convicted [her] had the jury been given a correct jury instruction—an instruction

> that did not permit a conviction based on recklessness.

*Id.* Put simply, if: (1) competing facts regarding a defendant's *mens rea* exist; (2) there's a reasonable probability the juror based their conviction on a party's version of events that would not have otherwise resulted in a conviction under proper instructions; and (3) a jury instruction fails to instruct the jury on the requisite *mens rea* to convict, then the defendant has been prejudiced by the instruction and trial counsel's failure to object to it.

¶34 We have exactly that situation before us today. Eyre and the State recounted conflicting versions of the deadly robbery. Eyre, in one of his versions, claimed he disagreed with Rakes' plan to steal the Dodge Challenger, had even tried to talk Rakes out of it, was not engaged in conversation with Rakes and Simon when Rakes flashed his pistol at Simon and Xoumphonphackdy, was not himself armed, and was not aware whether Rakes was armed. This factual scenario creates the reasonable possibility that Eyre did not intend for the robbery to be committed and thus was not searching for jumper cables in the back of the PT Cruiser with the intent to effectuate the robbery, but rather was doing so to buy time or to appease or mollify Rakes, who had insisted on committing the robbery despite Eyre's alleged pushback.[8]

¶35 This version of events establishes, at most, Eyre's recklessness as to the commission of the aggravated robbery, thus falling below the required intentional *mens rea* of that offense. And while the State argues Eyre flashed a gun alongside Rakes, Eyre's account is supported by Xoumphonphackdy, a victim of the robbery, who stated that Eyre remained at the back of the PT Cruiser and "didn't do anything to further th[e] crime." And so, given that Eyre's

---

[8] We do not mean to imply that a defendant is always off the accomplice liability hook when they allege to have known of a plan to commit a criminal offense but did not adhere to it. Here, in Eyre's telling, he expressed that he did not want to go through with it, thus leaving open the possibility that Eyre did not have the requisite intent. But if the underlying crime requires a lower *mens rea*, such as reckless burning, *see supra* ¶ 18, an accomplice defendant claiming to know of the plan but to have digressed from it out of a desire that the crime not be committed will nonetheless be liable as an accomplice because they have met the requisite recklessness *mens rea*.

account creates a reasonable possibility that he did not intend for the aggravated robbery to occur, which is further supported by Xoumphonphackdy's account, we conclude there was a reasonable probability that at least one juror voted to convict based on this factual scenario, which "would have been insufficient to sustain a conviction had the instruction been given correctly." *Id.* ¶ 27. As such, we find there is a "reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct." *Id.* ¶ 22. Trial counsel's deficient performance in failing to object to the instruction thus prejudiced Eyre.

## CONCLUSION

¶36 Jury Instruction No. 40 was erroneous—it failed to accurately and clearly instruct the jurors on the dual *mens rea* requirement under an accomplice liability theory. Moreover, related instructions did not cure No. 40's error but rather served to inject more confusion into the instructions. As such, we conclude that the court of appeals erred in holding that the instructions were sufficient.

¶37 And having concluded the instructions were erroneous, we also conclude that Eyre's right to effective assistance of counsel was violated. This case is characterized by multiple accounts and conflicting facts regarding Eyre's mental state during the armed robbery. While we do not opine on the veracity of either party's version of events, we recognize there is a reasonable probability that the erroneous instruction impermissibly allowed at least one juror to vote to convict Eyre despite believing that Eyre did not intend for the robbery to occur. Trial counsel should have recognized this possibility and should have objected, but did not. And this failure to cure the erroneous instruction prejudiced Eyre. Because both prongs of the *Strickland* test are satisfied, we reverse the court of appeals on the jury instruction issue, vacate Eyre's conviction, and remand for a new trial.

_____